

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-25-1997

# Deane v. Pocono Med Ctr

Precedential or Non-Precedential:

Docket
96-7174

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Deane v. Pocono Med Ctr" (1997). *1997 Decisions*. Paper 204.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/204

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 25, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-7174

STACY L. DEANE,
Appellant

v.

POCONO MEDICAL CENTER,
Appellee

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. Action No. 94-1139)

Argued
January 31, 1997

Before: BECKER and ROTH, Circuit Judges,
and BARRY, District Judge*

(Filed August 25, 1997)

_____
* Honorable Maryanne Trump Barry of the United States District Court
for the District of New Jersey, sitting by designation.


        GALFAND BERGER, LURIE,
        BRIGHAM, JACOBS, SWAN,
        JUREWICZ & JENSEN, LTD.
        BY: DEBRA A. JENSEN, ESQUIRE
         [Argued]
        DANIEL BENCIVENGA,
         ESQUIRE
        Suite 2300, 1818 Market Street
        Philadelphia, PA. 19103-3623
        Attorneys for Appellant
        Stacy L. Deane

        POST & SCHELL, P.C.
        BY: SIDNEY R. STEINBERG,
        ESQUIRE [Argued]
        1800 JFK Boulevard, 19th Floor
        Philadelphia, PA 19103
        Attorneys for appellee Pocono
        Medical Center

OPINION OF THE COURT

BARRY, District Judge

In recognition of the fact that discrimination against the physically and mentally disabled was a "serious and pervasive social problem," Congress, in 1990, enacted the Americans with Disabilities Act ("ADA" or "Act") in order to level the playing field for disabled individuals in the workplace. Toward this end, Congress extended the provisions of the ADA not only to those who are actually disabled, but also to individuals wrongly regarded as being disabled. Unfortunately, however, the extent to which individuals who are merely "regarded as" disabled are entitled to be treated as though they are actually disabled was left far from clear. We decide today an important issue of first impression in this circuit -- where, as here, an individual is "regarded as" being disabled but is not, in fact, disabled, the ADA does not entitle that individual to accommodation in the workplace.

2

I.

Appellant Stacy L. Deane, a former employee of appellee Pocono Medical Center ("PMC"), filed a complaint which alleged that PMC terminated her employment in violation of the ADA, 42 U.S.C. SS 12101 et seq.; the Rehabilitation Act of 1973, 29 U.S.C. SS 701 et seq.; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. SS 951 et seq.1 The district court granted summary judgment in favor of PMC, and Deane has appealed. For the reasons that follow, we affirm.

II.

In April 1990, PMC hired Deane as a registered nurse to work primarily on the medical/surgical floor of the medical center. On June 22, 1991, while all the nurses on the medical/surgical floor, with the exception of Deane and one other nurse, were at lunch, Deane responded to an emergency situation in a patient's room. Upon entering the room, Deane discovered an elderly male patient who had somehow removed all but one of his restraints and was hanging off his bed between the side rails. Because the patient was in danger of falling farther and pulling the intravenous line out of his neck, Deane lifted him back into his bed. As she was about to replace the last restraint, the patient grabbed her right wrist, twisting it counterclockwise and causing the injury which culminated in this case. That

injury -- a sprained right wrist and cartilage tear in the wrist -- caused her to miss approximately a year of work.

In June 1992, Deane and Barbara Manges, a nurse assigned to Deane's workers' compensation case, telephoned PMC and advised Charlene McCool, PMC's

_____

1. Although we will address only Deane's ADA claim, the only claim raised on appeal, our analysis applies equally to Deane's Rehabilitation Act and PHRA claims. See Kelly v. Drexel University, 94 F.3d 102, 105 (3d Cir. 1996) (holding that the district court properly treated the plaintiff's PHRA claims as coextensive with his ADA claim); McDonald v. Dep't of Public Welfare, 62 F.3d 92, 94 (3d Cir. 1995) (holding that, whether an action is brought under the ADA or the Rehabilitation Act, the substantive standards are the same). Neither party disputes this on appeal.

Benefits Coordinator, of Deane's intent to return to work with certain restrictions. According to Deane, she informed McCool that she was unable to lift more than 15-20 pounds or perform repetitive manual tasks, such as typing, but that her physician, Dr. Osterman, had released her to return to "light duty" work.2 Deane further explained to McCool that, if she could not be accommodated in a light duty position on the medical/surgical floor, she was willing to move to another area of the hospital, as long as she could remain in nursing.3

After speaking with Deane and Manges, McCool advised Barbara Hann, PMC's Vice President of Human Resources,

_____

2. In a letter dated June 8, 1992, the contents of which were communicated by Deane and Manges to McCool during their telephone conversation, Dr. Osterman opined as follows:

        I do not think [Deane] can return to unrestricted nursing i.e. I would
        place a lifting limit of 20 pounds and a limit on unrestricted
        repetitive motion of her wrist. She does believe that she can return
        to some nursing and I would agree with this. She has suggested
        pediatric nursing, neonatal nursing and possibly even the cancer
        unit at the hospital which apparently does not involve lifting the
        patients. All would be acceptable.

Another of Deane's physicians, Dr. Sipowicz, evaluated Deane approximately one week after Dr. Osterman's examination. His notes from June 16, 1992 reveal the following conclusions:

It is my professional opinion that Ms. Deane is permanently disabled from heavy activity and that she not have a position requiring lifting greater than 20 pounds, or that on a rare- or occasional basis, or any repetitive lifting using her right upper extremity. Ms. Deane is seeking employment in a neo-natal and/or oncology unit. This is quite all right with us. She is a registered nurse. She certainly is employable. If those positions become available, I feel that she should, indeed, take them. But regular floor nursing is, in my professional opinion, out of the question now and in the future. I feel that she is permanently disabled.

3. This telephone call was PMC's only interaction with Deane during which it could have assessed the severity of or possible accommodation for her injuries. PMC never requested additional information from Deane or her physicians. According to Deane, however, she subsequently attempted to contact PMC on several occasions and, at least once, was treated rudely by McCool and told not to call again.

4

of Deane's request to return to work, her attendant work restrictions, and her stated need for accommodation. Shortly after considering the information conveyed by McCool and after comparing it to the job description of a medical/surgical nurse at PMC, Hann determined that Deane was unable to return to her previous position. Hann then asked Carol Clarke, PMC's Vice President of Nursing, and Susan Stine, PMC's Director of Nursing Resources/Patient Care Services, to review Deane's request to return to PMC and explore possible accommodations for her. Both Clarke and Stine concluded that Deane could not be accommodated in her previous job as a nurse on the medical/surgical floor or in any other available position at the hospital. Finally, Hann asked Marie Werkheiser, PMC's Nurse Recruiter, whether there were any current or prospective job openings for registered nurses at PMC. According to Werkheiser, there were no such openings at that time.

As a result of the collective determination that Deane could not be accommodated in her previous job or in any other available position in the hospital, PMC sent Deane an "exit interview" form on August 7, 1992. On August 10, 1992, Hann notified Deane by telephone that she could not return to work because of her "handicap," and this litigation ensued.4

Deane argued before the district court that she was both actually disabled as a result of her injury and that she was perceived to be so by PMC. On summary judgment, the

court rejected both theories and held that Deane was
neither disabled nor regarded by her employer as being
disabled and that, even if she were, she failed to meet the
statutory definition of a qualified individual with a
disability. Deane has not appealed the district court's
determination that she was not actually disabled. Indeed,
she now concedes that "[i]n light of the decisional trends in
this Circuit and others," she is not now and never was

_____

4. In March 1993, Deane accepted a registered nurse position at a non-
acute care facility, where she remained until May 1993. Deane has been
employed by a different non-acute care facility since July 1993. These
positions do not require heavy lifting, bathing patients, or the like.

5

disabled and, consequently, that, but for PMC's erroneous
perception of her actual impairment, she would have no
claim under the ADA.

What is left for us, then, are Deane's contentions that
she was disabled under the terms of the ADA by virtue of
the fact that PMC regarded her limitations as being far
worse than they actually were, that PMC failed to
accommodate her lifting restriction, and that she was
eventually terminated on account of PMC's perception that
she was disabled. In support of her perception claim, Deane
relies on a so-called "laundry list" of PMC's allegedly
erroneous perceptions. According to Deane, PMC believed
that she was unable to lift more than ten pounds, push or
pull anything, assist patients in emergency situations,
move or assist patients in the activities of daily living,
perform any patient care job at PMC or any other hospital,
perform CPR, use the rest of her body to assist patients,
work with psychiatric patients, or use medical equipment.[5]
Deane refutes each of these perceptions -- or, in her view,
misperceptions -- and contends that her injury was, in
fact, minor in nature.[6] Deane further contends that PMC
should be held responsible for these misperceptions
because they were the result of PMC's "snap judgment"
arrived at without analyzing, investigating or assessing, in
good faith, the nature of her injury.

Finally, notwithstanding Deane's contention that her
impairment was minor, Deane has maintained throughout
the course of this litigation, and continues to maintain on
appeal, that she requires and is entitled to accommodation
for her lifting restriction.[7] In this regard, Deane contends

_____

5. With the exception of certain alleged misperceptions that are not even

arguably borne out by the record, such as Deane's inability to open file drawers or operate housekeeping equipment, we accept, as we must, Deane's description of PMC's misperceptions.

6. Given that Deane vigorously maintained before the district court that she was actually disabled and has only now shifted her sole focus to her perception claim, Deane's position in this regard is somewhat disingenuous.

7. Aside from a few scattered references in her briefs on appeal and at oral argument suggesting that she could have performed the lifting

6

that she could be accommodated either in her previous position as a nurse on the medical/surgical floor or through reassignment to another position that would not require heavy lifting. As to the former, Deane has, from the outset, suggested the following accommodations: (1) the use of an assistant to help her move or lift patients; (2) the implementation of a functional nursing approach, in which nurses would perform only certain types of nursing tasks; and (3) the use of a Hoyer lift to move or lift patients. With respect to the latter, Deane maintains that she could have been transferred to another unit within the medical center such as the pediatrics, oncology, or nursery units, which would not have required heavy lifting.

III.

We have appellate jurisdiction over the district court's grant of summary judgment pursuant to 28 U.S.C. S 1291. Because our standard of review is plenary, Kelly v. Drexel University, 94 F.3d 102, 104 (3d Cir. 1996), we apply the

_____

required of a nurse on the medical/surgical floor with no accommodation, Deane's main argument on appeal is that accommodation was wrongly withheld. Indeed, the bulk of her submissions to this court focuses on the argument that had PMC engaged in interactive communications with her, it would have realized that her impairments could have been easily accommodated. Deane never informed PMC that she could have performed the required lifting without accommodation and the record is entirely bereft of any evidence that she could have performed without accommodation at the time of her termination. More importantly, Deane argued to the district court that she could have been accommodated through job restructuring or reassignment and never once contended in her brief in opposition to PMC's motion for summary judgment that no accommodation was necessary. Accordingly, Deane will not be allowed to transform the nature of this case, yet again, by relying on arguments raised for the first time on appeal.

Deane's alternative argument in this regard is that she can perform the essential functions of her previous job without accommodation because, according to Deane, lifting is not an essential function of nursing. As discussed below, this position is not only factually untenable, but is legally irrelevant.

same test the district court should have applied in the first instance. Olson v. General Electric Astrospace, 101 F.3d 947, 951 (3d Cir. 1996); Helen L. v. DiDario, 46 F.3d 325, 329 (3d Cir. 1995). We must determine, therefore, whether the record, when viewed in the light most favorable to Deane, shows that there is no genuine issue of material fact and that PMC was entitled to summary judgment as a matter of law. See, e.g., Olson , 101 F.3d at 951; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

IV.

Congress enacted the ADA in 1990 in an effort to remove societal barriers that historically have prevented disabled individuals "from enjoying the same employment opportunities that are available to persons without disabilities."8 29 C.F.R. App. S 1630, Background. Despite Congress's stated purpose of providing "clear, strong, consistent, enforceable standards," 42 U.S.C. S 12101(b)(2), however, the statutory language does not well serve that end. See Note, The Americans With Disabilities Act: Great Progress, Greater Potential, 109 Harv. L. Rev. 1602, 1615 (1996) ("One of the Act's major problems is its vagueness. Many of the statute's terms are ambiguous, leaving employers and disabled individuals uncertain about their rights and responsibilities and requiring costly litigation to

_____

8. The ADA, itself, provides the following statement of purposes:

     (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

     (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

     (3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

     (4) to invoke the sweep of congressional authority, including the

power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

42 U.S.C. S 12101(b).

resolve the uncertainties."). As a result, courts have been left to determine, with little legislative history to assist them, the meaning and application of vague terms and concepts through a fact-sensitive, case-by-case inquiry. We do not mean to suggest, however, that Congress is necessarily to be faulted for its lack of specificity, as the capabilities of disabled persons and the manifestations of their disabilities are often as diverse and unique as are the individuals themselves. Nevertheless, the use of vague and general standards rather than strict guidelines -- particularly with respect to what constitutes a disability, a qualified individual, and reasonable accommodation -- has permitted inconsistent if not absurd judgments and favored those with easily accommodated disabilities or minor impairments, rather than those with serious disabilities who seek nothing more than the equal employment opportunities to which they are entitled. Id.

The core antidiscrimination section of the ADA provides that:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. S 12112 (emphasis supplied). Thus, in order to make out a prima facie case under the ADA, a plaintiff must be able to establish that he or she (1) has a "disability," (2) is a "qualified individual," and (3) has suffered an adverse employment action because of a disability. See, e.g., Turco v. Hoechst Celanese Corp., 101 F.3d 1090, 1092 (5th Cir. 1996) (citing Rizzo v. Children's World Learning Centers, Inc., 84 F.3d 758, 763 (5th Cir. 1996)); Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995) (citing Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir. 1995)). The August 10, 1992 call from Ms. Hann terminating Deane because of her "handicap" is uncontroverted direct evidence that Deane suffered an adverse employment action because of her employer's perception of her disability. Deane has, therefore, established the third element of her prima facie

case and that element will not be discussed in further detail.9
See Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 (4th
Cir. 1997) ("When an employer concededly discharges an
employee because of a disability, the employee need prove
nothing more to meet the third prong of the prima facie
test").

A.

Mirroring the elements of the prima facie case, the first
step in deciding any ADA claim is to determine whether the
plaintiff is disabled under the terms of the Act. The ADA
defines a "disability" as:

> (A) a physical or mental impairment that substantially
> limits one or more of the major life activities of such
> individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. S 12102(2); 29 C.F.R. 1630.2(g). 10

Because, on appeal, Deane concedes that she is not
actually disabled, but that she was only "regarded as" being
disabled, we direct our focus to the third tier of the
statutory definition. Read in conjunction with thefirst tier
of the definition, defining an actual disability, the third tier
requires us to determine whether PMC regarded Deane as
having an impairment and whether the impairment, as
perceived by PMC, would have substantially limited one or

_____

9. Likewise, because of this direct evidence, there is no need to analyze
Deane's claims under the McDonnell Douglas burden shifting framework.
See Torre v. Casio, Inc., 42 F.3d 825, 829 n.3 (3d Cir. 1994) (citing
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

10. Because the ADA does not define many of the pertinent terms,
phrases, or concepts, we are guided by the Regulations issued by the
Equal Employment Opportunity Commission ("EEOC") to implement Title
I of the Act. See 42 U.S.C. S 12116 (requiring the EEOC to implement
said Regulations); 29 C.F.R. S 1630.2. Regulations such as these are
entitled to substantial deference. See Chevron, U.S.A., Inc. v. Natural
Resources Defense Council, Inc., 467 U.S. 837, 844 (1984); Blum v.
Bacon, 457 U.S. 132, 141 (1982); Helen L., 46 F.3d at 331-32.

more of Deane's major life activities. Deane's actual impairment, therefore, is of no consequence to our analysis. Parenthetically, it initially may seem odd that Congress chose to extend the protections of the Americans with Disabilities Act to individuals who have no actual disability. The primary motivation for the inclusion of perceptions or, more appropriately, misperceptions, of disabilities in the statutory definition, however, was that "society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment."[11] See 29 C.F.R. App.

_____

11. The limited legislative history makes clear that Congress's primary concern in enacting the "regarded as" prong of the ADA was for individuals with no limitations but who, because of some non-limiting impairment, are prevented from obtaining employment as a result of society's myths, fears and prejudices. As the final House Report provides,

> The rationale for this third test [the "regarded as" prong] as used
> in the Rehabilitation Act of 1973, was articulated by the Supreme
> Court in School Board of Nassau County v. Arline. The Court noted
> that although an individual may have an impairment that does not
> in fact substantially limit a major life activity, the reactions of others
> may prove just as disabling. `Such an impairment might not diminish
> a person's physical or mental capabilities, but could nevertheless
> substantially limit that person's ability to work as a result of the
> negative reactions of others to the impairment.'
>
> The Court concluded that, by including this test, `Congress
> acknowledged that society's accumulated myths and fears about
> disability and diseases are as handicapping as are the physical
> limitations that flow from actual impairment.'

H.R. Rep. No. 485 (III), 101st Cong., 2d Sess. 1990, 1990 U.S.C.C.A.N. 445 (emphasis added).

The only two examples given in the House Report of individuals regarded as disabled are individuals with cosmetic impairments, such as burn scars, and individuals who "are rejected from jobs because a back x-ray reveals some anomaly, even though the person has no symptoms of a back impairment." Id. (emphasis added). Neither of these examples involves individuals with limitations. Accordingly, there is no indication in the legislative history that Congress gave any thought whatsoever to individuals who, like Deane, are not actually disabled but who are impaired to the extent that they would require accommodation.

S 1630.2(l) (citing School Bd. of Nassau County v. Arline, 480 U.S. 273, 284 (1987)). Thus, as one of our sister circuits has appropriately recognized, a perception claim

> [a]lthough at first glance peculiar, actually makes a better fit with the elaborate preamble of the Act, in which people who have physical or mental impairments are compared to victims of racial and other invidious discrimination. Many such impairments are not in fact disabling but are believed to be so, and the people having them may be denied employment or otherwise shunned as a consequence. Such people, objectively capable of performing as well as the unimpaired, are analogous to capable workers discriminated against because of their skin color or some other vocationally irrelevant characteristic.

Vande Zande v. Wisconsin Dep't. of Administration, 44 F.3d 538, 541 (7th Cir. 1995) (emphasis supplied).

The EEOC Regulations provide that an individual is "regarded as" being disabled if he or she

> (1) [h]as a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

> (2) [h]as a physical or mental impairment that substantially limits major life activities only as a result of the attitude of others toward such impairment; or

> (3) [h]as none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.12

_____

12. 29 C.F.R. 1630.2(h) defines "physical or mental impairment" as:

> (1) [a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

> (2) [a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness,

and specific learning disabilities.

29 C.F.R. S 1630.2(l). See also S. Rep. No. 116, 101st
Cong., 2d Sess. 23 (1989) ("Senate Report"); H.R. Rep. No.
485 pt. 2, 101st Cong., 2d Sess. 53 (1990) ("House Labor
Report"), reprinted in 4 U.S. Code Cong. & Admin. News
335; H.R. Rep. No. 485 pt. 3, 101st Cong., 2d Sess. 29
(1990) ("House Judiciary Report"), reprinted in 4 U.S. Code
Cong. & Admin. News 452. Significantly, common to each
definition is the requirement that the individual not in fact
have an impairment that, absent the misperceptions of
others, would substantially limit a major life activity.

Each of the three definitions of being "regarded as"
disabled, as set forth in the Regulations, applies, as
written, to a discrete factual setting. The first applies to an
individual with an impairment that others might consider
to be a disability but does not technically fall within the
statutory definition of an actual disability. For example, if
an employee has high blood pressure, which is controlled
and is not substantially limiting, and if an employer
reassigns that employee to a less strenuous job because of
unsubstantiated fears that the employee will suffer a heart
attack if he or she continues to perform strenuous work,
the employee would have been perceived as disabled. 29
C.F.R. app. S 1630.2(l). The second definition applies to an
individual who has an impairment that might not ordinarily
be considered a disability, but is, nonetheless, substantially
limiting because of the attitudes of others toward it. For
example, if an employee has a prominent facial scar that is
not otherwise substantially limiting, and if an employer
discriminates against that employee because of customers'
negative reactions to the scar, the employee would have
been perceived as disabled. Id. Finally, the third definition
targets a person who has no impairment at all but is
treated by his or her employer as if he or she is disabled.
For example, if an employer discharges an employee in
response to a rumor that the employee was infected with
Human Immunodeficiency Virus ("HIV"), even though the
rumor was completely unfounded, the employee would have
been perceived as being disabled and, therefore, would be
disabled for purposes of the ADA. Id.

Deane contends that she satisfies the first definition
because PMC erroneously perceived the nature and extent

of her impairment. In order to maintain a "regarded as"
claim under the ADA, however, a plaintiff must
demonstrate more than the fact that an employer
misperceived the severity of the impairment. Rather, a
plaintiff must demonstrate that the impairment, as
erroneously perceived by his or her employer, would
"substantially limit" one or more of his or her "major life
activities."13 See generally Olson, 101 F.3d at 953-55;

_____

13. Major life activities include, but are not limited to, "functions such as
caring for oneself, performing manual tasks, walking, seeing, hearing,
speaking, breathing, learning, and working," see 29 C.F.R. S 1630.2(I), as
well as "sitting, standing, lifting, [and] reaching." 29 C.F.R. app.
S 1630.2(I); Senate Report at 22; House Labor Report at 52; House
Judiciary Report at 28-29.

An individual is defined as "substantially limited" in a major life
activity other than working if he or she is

        (I) [u]nable to perform a major life activity that the average
person
        in the general population can perform; or

        (ii) [s]ignificantly restricted as to the condition, manner or
duration
        under which an individual can perform a particular major life
        activity as compared to the condition, manner or duration under
        which the average person in the general population can perform the
        same major life activity.

29 C.F.R. S 1630.2(j)(1). In determining whether a person is substantially
limited in a major life activity, courts should consider

        (I) [t]he nature and severity of the impairment;

        (ii) [t]he duration or expected duration of the impairment; and

        (iii) [t]he permanent or long term impact, or the expected
permanent
        or long term impact of or resulting from the impairment.

29 C.F.R. S 1630.2(j)(2).

Where, as here, the major life activity at issue is working, the term
"substantially limited" is defined as "significantly restricted in the
ability
to perform either a class of jobs or a broad range of jobs in various
classes as compared to the average person having comparable training,
skills and abilities." Olson, 101 F.3d at 952 (citing 29 C.F.R.
S 1630.2(j)(3)(I)). Thus, the mere "inability to perform a single,
particular

job does not constitute a substantial limitation in the major life activity
of working." Id. In making these determinations, courts may consider

MacDonald v. Delta Airlines, Inc., 94 F.3d 1437, 1445 (10th Cir. 1996); Bridges v. City of Bossier, 94 F.3d 329, 333-34 (5th Cir. 1996).

After rejecting Deane's claim that she was actually disabled, a conclusion that Deane does not challenge here, the district court rejected her perceived disability claim on three grounds. First, the court found, as a matter of undisputed fact, that PMC regarded Deane's impairment as limiting her ability to work as a nurse on the surgical/medical floor but not her ability to work as a nurse in general. Next, the court determined that Deane could not have been precluded from working in general in her field because, following her termination from PMC, she held two positions as a registered nurse. Finally, the court concluded, as a matter of law, that PMC's perception of Deane's impairment was not motivated by "myth, fear or stereotype" and, therefore, was not actionable under the ADA. While, as noted earlier, we affirm the district court's conclusion that summary judgment should be granted on Deane's "regarded as" claim, we do so not on the grounds the district court found persuasive, as each of those grounds was error.

Taking the three grounds in reverse order, although the legislative history to the ADA indicates that Congress was concerned about eliminating society's myths, fears,

_____

     (A) [t]he geographical area to which the individual has reasonable
     access;

     (B) [t]he job from which the individual has been disqualified
because
     of an impairment, and the number and types of jobs utilizing
similar
     training, knowledge, skills or abilities, within that geographical
area,
     from which the individual is also disqualified because of the
     impairment (class of jobs); and/or

     (C) [t]he job from which the individual has been disqualified
because
     of an impairment, and the number and types of other jobs not
     utilizing similar training, knowledge, skills or abilities, within
that

geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. S 1630.2(j)(3)(ii).

15

stereotypes and prejudices with respect to the disabled, the EEOC's Regulations and interpretive appendix make clear that even an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability. 29 C.F.R. app. S 1630.2(l). Thus, whether or not PMC was motivated by myth, fear or prejudice is not determinative of Deane's "regarded as" claim.

The second ground -- that Deane's subsequent employment in the field of nursing demonstrated that she was not substantially limited in the major life activity of nursing -- confuses her actual impairment with PMC's misperception thereof, confusion caused in no small part by Deane having raised, in the alternative, these wholly inconsistent claims before the district court. In any event, Deane's subsequent work history could, at most, reflect her lack of an actual disability. It sheds no light, however, on whether, at the time of her termination, PMC regarded her impairment as substantially limiting her ability to work.

Finally, in determining whether PMC regarded Deane as substantially limited in the major life activity of working, the district court overlooked evidence which could have precluded summary judgment. Specifically, the court failed to consider the affidavit of Deane's vocational expert, Daniel Rappucci, who attempted to tie PMC's perception of Deane's injury to potential limitations in the workplace, both with respect to the "class of jobs" and "broad range of jobs" from which Deane would have been excluded.14  We need not,

_____

14. Some courts have held that summary judgment is appropriate when a plaintiff fails to produce vocational evidence with reference to the factors delineated in 29 C.F.R. S 1630.2(j)(3)(ii), factors tailored specifically to the major life activity of working and, instead, relies solely on the factors set forth in 29 C.F.R. S 1630.2(j)(2). See, e.g., Bolton v. Scrivner, 36 F.2d 939, 944 (10th Cir. 1994), cert. denied, 115 S. Ct. 110 (1995); Dotson v. Electro-Wire Products, Inc. , 890 F. Supp. 982, 988-89 (D. Kan. 1995); Marschland v. Norfolk and Western Ry. Co., 876 F. Supp. 1528, 1539 (N.D. Ind. 1995), aff'd on other grounds, 81 F.3d 714 (7th Cir. 1996). Such a bright-line rule appears to be inconsistent with the wording of the Regulations, which provides that the factors enumerated

in 29 C.F.R. S 1630.2(j)(2) "should" be considered and that those listed in 29 C.F.R. S 1630.2(j)(3)(ii) "may" be considered. In any event, Deane presented vocational evidence tying PMC's perception of Deane's impairment to the factors set forth in 29 C.F.R.S 1630.2(j)(3)(ii).

however, remand for a determination of whether, in light of this vocational evidence, summary judgment should be granted on Deane's "regarded as" claim because, as is discussed below, she cannot, as a matter of law, prevail on that claim.

B.

The second element of a prima facie case under the ADA requires a plaintiff to demonstrate that he or she is a "qualified individual." The ADA defines the term "qualified individual with a disability" as an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. S 12111 (8). The interpretive appendix to the EEOC Regulations divides this inquiry into two prongs. First, a court must determine whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires. 29 C.F.R. app. S 1630.2(m). Second, the court must determine whether the individual, with or without reasonable accommodation, can perform the essential functions of the position held or sought.15 Id. See also Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 563 (7th Cir. 1996); Benson, 62 F.3d at 1112.

Determining whether an individual can, with or without reasonable accommodation, perform the essential functions of the position held or sought, is no easy task and conceptually should be separated into two distinct steps. First, a court should ask whether the disabled individual can perform all the requisite job functions without accommodation. If so, the individual obviously is qualified and, because he or she can perform all job functions without assistance, is not entitled to accommodation from his or her employer. If, however, the individual cannot perform all the requisite job functions without accommodation, the court must determine whether there

_____

15. Because PMC does not dispute Deane's general qualifications as a registered nurse, there is no need to dwell on the first step of the "qualified individual" analysis.

exists any reasonable accommodation to which the individual would be entitled that would enable him or her to perform the essential functions of the position.16

_____

16. "In general, an accommodation is any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities." 29 C.F.R. app. S 1630.2(o). The text of the ADA provides that "reasonable accommodation" may include--

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modifications of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. S 12111(9) (emphasis added).

The EEOC Regulations further define "reasonable accommodation" to include

> (I) modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the
> position such applicant desires; or

> (ii) modifications or adjustments to the work environment, or to the
> manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or

> (iii) modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of
> employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. S 1630.2(o)(1).

An individual's right to reasonable accommodation may be subject, however, to certain limitations. For example, an employer is not required to provide accommodation if it would impose an "undue hardship" on the employer as defined in 29 C.F.R. S 1630.2(p)(1) and (2). An employer also is not required to provide accommodation if the individual poses a "direct

threat" to the health or safety of himself/herself or others unless such accommodation would either eliminate such risk or reduce it to an acceptable level. 29 C.F.R. S 1630.2(r).

Several of our sister circuits have adopted a similar two pronged inquiry modeled on the Supreme Court's interpretation of the Rehabilitation Act in Arline, 480 U.S. at 287 n.17. The Fifth Circuit, for example, has held that

> [f]irst, we must determine whether the individual could perform the essential functions of the job[without accommodation], i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

Chandler v. City of Dallas, 2 F.3d 1385, 1393-94 (5th Cir. 1993) (emphasis added) (interpreting the Rehabilitation Act), cert. denied, 511 U.S. 1011 (1994). See also Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1170, 1174 (10th Cir. 1996) (interpreting the ADA); White v. York International Corp., 45 F.3d 357, 361-62 (10th Cir. 1995) (interpreting the ADA); Gilbert v. Frank, 949 F.2d 637, 640-42 (2d Cir. 1991) (interpreting the Rehabilitation Act).

While our re-formulation of the inquiry will invariably lead to the same results that would be reached under Chandler, our phraseology makes explicit what that of the Fifth Circuit, if correctly applied, leaves implicit. That is, our phraseology embodies the common sense notion that any employee, disabled or otherwise, must be able to perform all the requisite functions of a given job unless the individual is entitled to accommodation by operation of the ADA or a similar remedial statute. The problem with the Fifth Circuit test is that it is easily misapplied and, as a result, could lead to the mistaken impression that a disabled individual -- or one perceived to be disabled -- who could perform the essential functions of a job without accommodation as to those functions, but who could not perform one or more marginal or nonessential tasks, should be considered qualified without accommodation. That conclusion, however, would overlook the fact that job restructuring, i.e., excusing the performance of nonessential functions or reassigning them to other employees, is itself a statutorily defined form of

accommodation. 42 U.S.C. S 12111(9)(B).17 So accommodated, then, and only then, would the individual be able to perform the essential functions of the position. Thus, the formulation we posit today better allows courts and parties alike to remain focused on the fact that an employee who is excused from performing marginal tasks is being accommodated and, in turn, on whether such accommodation is statutorily required.18

Applying our two-pronged inquiry to the facts of the case before us, it is clear that Deane could not perform all the requisite functions of her position. To arrive at this conclusion, we, of course, shift our focus from PMC's misperceptions back to Deane's actual capabilities and limitations. To proceed otherwise would allow an employer's misperceptions not only to render an individual disabled, but to defeat his or her claim by rendering him or her unqualified as well.

The record before us reveals that both PMC and Deane acknowledged that lifting patients was a function or condition, be it essential or otherwise, of employment as a

_____

17. The dissent charges us with improperly importing the consideration of nonessential functions into the qualified individual analysis for "regarded as" plaintiffs. It is Congress, however, that defined "accommodation" to include the restructuring or reassigning of nonessential functions. 42 U.S.C. S 12111(9)(B). Thus, when determining whether an individual can, with or without accommodation, perform the essential functions, see 42 U.S.C. S 12111(8), courts necessarily must look to whether the individual may be excused from the nonessential functions that he or she cannot perform. Indeed, the lynchpin of the ADA is that a disabled individual's qualifications are to be assessed only after he or she is accommodated through job restructuring or otherwise. Where that accommodation is not available, we do not read the ADA as permitting the individual or the court to focus exclusively on the essential functions of the relevant position.

18. It is clear that when Congress included job restructuring within the definition of reasonable accommodation, it envisioned only the restructuring or reallocating of the marginal functions of a given position. As the appendix to the regulations indicates, an employer is never required to reallocate essential functions, as essential functions are, by definition, those that the employee must be able to perform. 29 C.F.R. app. S 1630.2(o).

20

registered nurse on the medical/surgical floor. That being undisputed, both of Deane's treating physicians were of the opinion that, in June of 1992, Deane was "permanently disabled from heavy activity," that she could "return to work but cannot do unrestricted lifting," and that her limitations "should be considered permanent." 19 (See June 8, 1992 and June 16, 1992 letters of Drs. A. Lee Osterman and Carl Sipowicz, respectively.) In addition, Deane testified at her deposition that, while lifting patients was necessary for complete patient care, her restrictions would have made doing so dangerous and would have presented "an awful risk" to both her and her patients.20  Thus, when she felt ready to return to work, she informed PMC that she had a lifting restriction and hoped to be put on light duty assignments or be reassigned to another area of the hospital. Most importantly, she never argued before the district court on summary judgment that she could perform the requisite heavy lifting. Rather, she contended that her

_____

19. The fact that these diagnoses might have changed in the years following Deane's injury is irrelevant to the issue of Deane's limitations and capabilities at the time of the adverse employment action.

20. At Deane's deposition, the following exchange took place:

Q. Was it ever necessary for a total care patient to put them in a wheelchair?

A. When I was working there?

Q. Yes.

A. Yes. Not for their bath, but --

Q. Could you have done that with a lifting restriction?

A. With a lifting restriction, no. I'd like to rephrase that. I suppose anything is possible, if you think about it, we are taking an awful risk. I may or may not have been able to get that patient out of the bed and into the wheelchair. I don't think it's a worthwhile risk to take when you take a chance that somebody could fall.

Q. So that would have been dangerous for the patient?

A. I would think so, yes.

Q. Probably dangerous for you as well, correct?

A. Possibly.

lifting restriction easily could have been accommodated through either reassignment or job restructuring. Thus, it is clear that Deane could not perform all functions of the position without some form of accommodation.

Accordingly, we next must determine whether Deane is entitled to accommodation and, if so, whether reasonable accommodations exist that would enable her to perform the essential functions of the position. Deane is at most statutorily disabled in that, while her impairment does not rise to the level of being a disability, PMC might well have perceived her to be disabled. In other words, but for her employer's misperception, she would not be afforded the protections of the ADA at all. Viewed as such, we do not believe that Congress intended that an individual who is only perceived to be disabled would be entitled to accommodation.

We begin our analysis of Congressional intent on this issue with the text of the statute, itself. The core anti-discrimination provision of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual...." 42 U.S.C. S 12112(a) (emphasis added). Thus, while far-reaching, the ADA is not boundless and only prohibits discrimination engaged in "because of [the individual's] disability." Id. In turn, the Act defines the term "discriminate" as including an employer's failure to "make[ ] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability...." 42 U.S.C. S 12112(b)(5)(A). On its face, however, this definition leaves open the question of which limitations the employer must accommodate. Specifically, it does not indicate whether an employer must accommodate any limitation that adversely affects a disabled employee's performance or only those limitations caused by his or her disability. Reading the two subsections together, we are convinced that the ADA requires an employer to accommodate only those limitations caused by the individual's disability.

This reading is borne out repeatedly in the appendix to the Regulations regarding reasonable accommodation. There it is stated, in explicit terms, that "[a]n individual

with a disability is `otherwise qualified'... if he or she is

qualified for a job, except that, because of the disability, he or she needs a reasonable accommodation..."; that "[e]mployers are obligated to make reasonable accommodation only to the physical or mental limitations resulting from the disability of a qualified individual..."; and that "[w]hen a qualified individual with a disability has requested a reasonable accommodation... the employer... should... ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation. 29 C.F.R. app. S 1630.9 (emphasis added).

Likewise, requiring accommodation only for that which actually renders an employee disabled is virtually mandated by Congress's intent "to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities." 29 C.F.R. app., Background (emphasis added). With the passage of the ADA, Congress intended not to erect impenetrable spheres of protection around the disabled, but hoped merely "to level the playing field" for them. Siefken v. Village of Arlington Heights, 65 F.3d 664, 666 (7th Cir. 1995). Thus, where an individual is actually disabled, Congress recognized that reasonable accommodations would often be necessary to, in a sense, compensate for the individual's disability and allow him or her to compete with the non-disabled. See Vande Zande, 44 F.3d at 541 (recognizing that Congress was "unwilling to confine the concept of disability discrimination to cases in which the disability is irrelevant to the performance of the disabled person's job"). Once accommodated for his or her disability, an individual should be on an equal playing field with others and thereafter would be on his or her own to deal with any non-disabling impairments just as would any similarly impaired person without a disability.

In the context of an individual who is not actually disabled but is merely "regarded as" such, i.e., one who is only statutorily disabled, that which renders him or her disabled is not the individual's impairment, if impairment there be, but the employer's unfounded stereotypes, fear or simple misperception that the impairment is serious

23

enough to be disabling. To compensate for a statutory disability, then, the employer need only be dispossessed of its misperception as it is that which renders the employee disabled. Thereafter, the individual would be neither actually nor statutorily disabled and, like any non-disabled individual, would not be able to invoke the accommodation provisions of the ADA for any non-disabling impairments --

including the impairment that initially might have given rise to the employer's perception of a disability. Accommodation, therefore, would play no role in leveling the playing field.21 Indeed, to hold otherwise would give an individual "regarded as" being disabled an undeserved windfall were he or she to have a right to be accommodated solely by virtue of the employer's misperception where others with the same impairment would have no such right.22

_____

21. The evil the "regarded as" provision was intended to combat was the effect of "archaic attitudes," erroneous perceptions, and myths. Arline, 480 U.S. at 279, 285; Wooten, 58 F.3d at 385-86. As more than one court has recognized, an ADA perception claim is akin to a racial discrimination claim in which an individual is denied employment because the employer erroneously perceived that the color of the individual's skin somehow made him or her inferior. See, e.g., Vande Zande, 44 F.3d at 541. Title VII proscribes such invidious discrimination and protects individuals who suffer adverse consequences as a result thereof. Such protection, however, does not include any form of "accommodation" because it is presumed that the individuals can perform their jobs without accommodation. Because the type of discrimination faced by those who are perceived to be disabled so closely resembles discrimination on the basis of race, with the only significant difference being the object of the misperception, we see no reason not to treat them in like fashion.

22. It is not by coincidence that this analysis dovetails neatly with the EEOC's suggestion that, once a request for accommodation is made, the employer and employee should engage in a flexible, interactive exchange whereby the employer can become familiar with the precise contours of the employee's limitations and can devise appropriate and effective accommodations. 29 C.F.R. app. 1630.9. After an employee requests accommodation, a meaningful interactive exchange could well rectify any misperceptions regarding the employee's impairments. Ideally, once the true facts are discovered, the employer could either provide reasonable accommodation if it believes the employee to be actually disabled or refuse to do so based on its belief that the employee is not, in fact, disabled. Of course, if the employer takes the latter course, it will do so

24

We are aware of only one decision of a Court of Appeals that has held that accommodation is appropriate in the context of a perceived disability claim, and no decision that has held that it is not -- until this one. In Katz v. City Metal Co., Inc., 87 F.3d 26 (1st Cir. 1996), the plaintiff, a recent heart-attack victim, sought accommodation from his employer in the form of a part-time work schedule in connection with his "actual" and "perceived" disability claims. After the district court granted summary judgment

in favor of the employer, the First Circuit reversed on the basis that there was enough evidence to reach the jury on the perception claim. Id. at 32. In doing so, the court held that, irrespective of whether the plaintiff was actually disabled, he would be entitled to reasonable accommodation if the employer perceived him to be disabled, reasoning that

> Congress, when it provided for perception to be the basis of disability status, probably had principally in mind the more usual case in which a plaintiff has a long-term medical condition of some kind, and the employer exaggerates its significance by failing to make a reasonable accommodation. But both the language and the policy of the statute seem to us to offer protection as well to one who is not substantially disabled or even disabled at all but is wrongly

_____

at the risk of an ADA lawsuit being filed against it alleging that the employee is actually disabled. The employee would not, by definition, however, be able to allege the facts necessary to make out a perception claim because the employer's position would be that the employee is not disabled.

We agree with Deane that PMC's efforts in this regard were dismal and fell far below what has been suggested by the EEOC and required by us. See Mengine v. Runyon, 114 F.3d 415, 420-21 (3d Cir. 1997). Had PMC engaged in a meaningful interactive process, moreover, it assuredly would have realized the minor nature of Deane's limitations. And, of course, while Deane would not have been entitled to any form of accommodation or protection under the ADA given the minor nature of her limitations, PMC may well have decided to retain her in one of a number of positions available during the relevant period of time, rendering this litigation unnecessary. PMC deserves no medals.

25

> perceived to be so. And, of course, it may well be that Katz was both actually disabled and perceived to be so.

Id. at 33.

We disagree with both the First Circuit's reasoning and its conclusion. Initially, the court's position that an individual can be "both actually disabled and perceived to be so" is contrary to the unambiguous definition of a perceived disability in which an element of each of the three categories of perceived disabilities is that the individual not have an actual disability. 29 C.F.R. S 1630.2(l). Thus, because the finding of an actual disability would prevent one from satisfying an essential element of a perception

claim, and vice versa, it necessarily follows that an individual simply cannot maintain a perception claim if he or she is actually disabled. Accordingly, actual and perceived disability claims cannot be presented as simultaneous grounds for relief.23

Moreover, the First Circuit mischaracterized the underlying intent of Congress in describing the "usual case" of a perceived disability as "a long-term medical condition of some kind, and the employer exaggerates its significance by failing to make a reasonable accommodation." To the contrary, it is clear that a person "who is not substantially disabled or even disabled at all but is wrongly perceived to be so" represents the paradigmatic perception plaintiff envisioned by Congress. See 29 C.F.R. app. S 1630.2(l); Senate Report at 23-24; House Labor Report at 53; House Judiciary Report at 29-31. Further, an employer's failure to make a reasonable accommodation, itself, cannot, as the court suggested, render the employee disabled, as the issue of reasonable accommodation becomes relevant to determining whether he or she is qualified only after the individual is found to be disabled.

Had the Katz court steered clear of these faulty premises, it is by no means certain that it would have assumed, as it did, that an individual who is only perceived to be disabled

_____

23. They can, however, be effectively pled in the alternative where, unlike
the case at bar, the plaintiff does not seek accommodation. See Olson, 101 F.3d at 952-55.

26

is entitled to accommodation from his or her employer. As a result, we do not find the opinion persuasive.

Accordingly, we hold that where an individual claims only to have been "regarded as" being disabled, that individual is not entitled to accommodation under the ADA. Thus, if an individual is perceived to be but is not actually disabled, he or she cannot be considered a "qualified individual with a disability" unless he or she can, without accommodation, perform all the essential as well as the marginal functions of the position held or sought.24

Of course, unlike the plaintiff in this case, the vast majority of ADA plaintiffs claim to have an actual disability. They must show simply that, once accommodated, they can perform the essential functions of the position. Individuals who are not actually disabled but are merely perceived to

be so are not entitled to accommodation. Only they must demonstrate their ability to perform all the functions of the position held or sought.

As a final matter, we must address a few points raised by the dissent that, in our view, are misplaced. The dissent repeatedly argues that a nondisabled individual with a limiting impairment is precisely the individual that the "regarded as" claim was designed to protect and that this class of individuals will be precluded from bringing suit under the ADA. That interpretation of the ADA is entirely unsupportable, and the dissent recognizes that it leads to a result even it concedes that some would call "untoward." Dissent at 41.

As we discussed at footnote 11, supra, none of the examples provided by Congress indicates a concern for nondisabled individuals who are impaired so as to require accommodation. Nevertheless, the dissent claims to find

_____

24. Given the state of the law at the time the district court issued its opinion, it is understandable that the court framed its analysis in terms of whether lifting was an essential function of Deane's position. As this opinion should make clear, however, the issue of whether a particular task is essential or marginal is irrelevant in a perception case. Once it is determined that an individual who is only perceived to be disabled cannot perform all the functions of the position held or sought, he or she is per se unqualified.

27

support for its interpretation in two examples provided by the Supreme Court in Arline, 480 U.S. at 283 n.9. The first is a child with cerebral palsy who was academically competitive and was not physically threatening. That child, however, had been excluded from public school not because he needed accommodation, but because "his physical appearance `produced a nauseating effect on his classmates.' " Id. (quoting 117 Cong. Rec. 45974 (1971)). The second of the Supreme Court's examples cited by the dissent is of a woman crippled with arthritis who could nevertheless do the job she sought. Like the prior example, however, that woman was denied a job not because of her limitations or need for accommodation, but because the "college trustees [thought] `normal students shouldn't see her.' " Id. Ironically, the dissent is correct that these two individuals would be archetypal "regarded as" plaintiffs. And, under today's holding, both could establish a prima facie case under the ADA with ease. Significantly, however, and consistent with today's holding, neither of those individuals, nor any of those mentioned in the legislative

history or the regulations, required accommodation to perform their jobs. Indeed, the dissent's concern for nondisabled individuals who require accommodation, as we believe it wrongly assumed the child and the woman did, appears to be no one's but the author's.

Finally, we are among those who the dissent recognizes will find that its interpretation impermissibly leads to a result that is "untoward"; indeed, we suggest that its interpretation impermissibly leads to a result that is absurd. The dissent concedes that a "regarded as" plaintiff can be terminated for not performing nonessential functions, but only after establishing at trial that he or she can perform the essential functions of the job and prevailing in his or her ADA suit. In other words, the dissent wishes to recognize a statutory right to reinstatement for "regarded as" plaintiffs for whom it, in the end, concedes that there is no lasting remedy. If Congress did not create a meaningful remedy in a remedial statute such as the ADA, however, we simply cannot believe that Congress intended to create the right. That said, we are wholly unpersuaded by the dissent's position that such plaintiffs should retain the ability to "bring" ADA lawsuits,

28

see Dissent at 41, when the only tangible benefit that can possibly be derived therefrom rests on an assumption that, after years of expensive litigation, an employer who once fired an individual for not being able to perform nonessential tasks would have a change of heart and not fire that individual again after being told by the court, or its counsel, that it is free to do so.

For the same reason, we believe that the dissent's invocation of the "mischief" rule is misplaced. Sir Edward Coke's "mischief" rule provides, in pertinent part, as follows: "The Office of Judges is always to make such construction as to suppress the Mischief and advance the Remedy." Heydon's Case, 3 Co. 7a, 7b, Magdalon College Case, 11 Co. 66b, 73b (quoted in United States v. Second Nat'l Bank of N. Miami, 502 F.2d 535, 541 (5th Cir. 1974) (Emphasis supplied). Given its own recognition that its position fails to guarantee any lasting remedy, the dissent's reliance on the "mischief" rule is, at best, strained. More importantly, the dissent misconceives the mischief that the "regarded as" prong was intended to prevent in the first instance. While the elimination of prejudice and misconceptions might have motivated Congress to enact the ADA, the mischief addressed was the exclusion of qualified individuals from the workplace, mischief the dissent, in our view, does not adequately address.

V.

Once the analysis discussed above is properly understood, applying it to the case at hand is a simple task. Indeed, Deane's own arguments are enough to defeat her claim. On appeal, Deane concedes that she is not disabled, but contends that she was perceived to be so by PMC. Further, prior to her termination, she requested that PMC accommodate her lifting restriction, a request that she continues to press here, and the record is utterly devoid of any evidence that, absent the requested accommodations, she could have performed the lifting required of nurses on the medical/surgical floor at the time she suffered the adverse employment action. Thus, while not entitled to accommodation because she was merely "regarded as" being disabled, she effectively concedes that she cannot

29

perform the functions of her prior position without it. As a result, she is not a qualified[25] individual with a disability and cannot, therefore, maintain a claim under the ADA. Accordingly, the order of the district court granting PMC's motion for summary judgment will be affirmed.

_____

25. That is, because Deane concedes that she cannot perform all the requisite job functions without accommodation and is not entitled to the accommodation that she concedes is necessary to enable her to perform the essential functions of the position, she cannot satisfy the qualified prong under the test delineated above.

30

BECKER, Circuit Judge, dissenting.

Judge Barry has written a thoughtful and scholarly opinion, but I cannot join it because it has construed the prima facie case under the Americans With Disabilities Act ("ADA") in a way that forecloses a class of so-called "regarded as" plaintiffs from bringing a lawsuit, and thereby undermines Congressional intent. More specifically, I take issue with the majority's holding that a "regarded as" plaintiff, in order to be considered qualified under the ADA, must show that she is able to perform all of the functions of the relevant position without accommodation. It is my view that a plaintiff need only show that she is able to perform the essential functions of the relevant position without accommodation.

I base my opinion on the statutory definition of a "qualified individual" under the ADA. That definition, in clear language, requires an analysis of the essential functions only. This reading of the statutory language is bolstered by materials published by the agencies charged with enforcing the ADA which state, in no uncertain terms, that non-essential functions have no place in determining whether an individual is qualified. Moreover, consistent with Congressional intent, this approach ensures that a "regarded as" plaintiff, who has a non-disabling physical impairment that prevents her from performing all of the functions of the relevant position and that leads an employer mistakenly to regard her as disabled, may bring an ADA lawsuit if the employer institutes an adverse employment decision based on that incorrect assessment of her impairment. I would remand this case to the district court in order for it to determine whether, as a factual matter, the Pocono Medical Center regarded Stacy Deane as disabled and whether lifting is an essential function of the jobs she sought.

I.

As the majority correctly points out, the prima facie case of an ADA claim includes three elements. First, a plaintiff must show that she is disabled. Second, she must show that she is qualified for the job she seeks. Finally, she must

show that she suffered some adverse employment action as a result of her disability. My concern arises from the majority's discussion of the second element of the prima facie case -- whether the plaintiff is a qualified individual with a disability.

A.

The ADA defines a qualified individual with a disability as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. S 12111(8).1 I agree with the majority that a determination whether an individual is so qualified is a two-step process. First, a court must examine whether the plaintiff can perform the job without accommodation. If so, then the plaintiff is qualified. If not, then, as a second step in the process, a court must examine whether the plaintiff can perform the job with a reasonable accommodation. If so, the plaintiff is qualified. If not, the plaintiff has failed to set out a necessary element

of the prima facie case.

I part company with the majority, however, when it requires that, under the first step in this process, a "regarded as" plaintiff must show that she can perform all of the functions of the job, essential and non-essential, without accommodation. My dissent is concerned only with this first step in the analysis of the second element of the prima facie case. I will assume arguendo that the majority is correct that a "regarded as" plaintiff is not statutorily entitled to an accommodation. I note, however, my uncertainty about this holding. The issue was not briefed by the parties, and I am simply unsure whether there are wider, unforeseen ramifications that would render this holding unwise. At all events, because of the manner in which I would decide Deane's appeal, I do not reach the contours of that second step.

_____

1. Of course, the individual must also satisfy "the requisite skill, experience, education and other job-related requirements of the employment position." 29 C.F.R. S 1630.2(m). There is no dispute here that Deane satisfies these requirements.

The majority reaches its conclusion by reasoning that an individual who is unable to perform a non-essential function of the job without some accommodation is rendered unable to perform the essential functions of the job without some accommodation because she has been accommodated as to a non-essential function. In so reasoning, the majority imports an examination of an individual's capabilities as to non-essential functions into an analysis that, by its statutory terms, is focused solely on essential functions. The majority does so without discussion as to how those statutory terms admit of any ambiguity or how a plain reading of those terms would lead to irrational results.

The majority supports its position with a strained reading of the statute. The majority argues that because the statute includes job restructuring as an accommodation, then an individual who requires job restructuring must not be able to perform the essential functions of the job without accommodation because the job restructuring is itself an accommodation, even though the job restructuring has only accommodated the individual as to the non-essential functions. Given the language of the statute, its purpose, and executive interpretations thereof, this analysis is wholly unpersuasive.

B.

The question as to the proper analysis of the first phase in the second element of the prima facie case is, at bottom, one of statutory interpretation. The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., ___ U.S. ___, 117 S. Ct. 843, 846 (1997). At least as I read it, S 12111(8), which defines "qualified individual," is plain and unambiguous. The first sentence of that section, quoted in pertinent part in part I.A., makes it clear that the phrase "with or without reasonable accommodation" refers directly to "essential functions." In fact, there is nothing in the sentence, other than "essential functions," to which "with or without reasonable accommodation" seems to refer; the only terms in the sentence for which an accommodation

33

would make any sense are "essential functions." In other words, there is simply no mention of non-essential functions in the statutory definition of "qualified individuals" and thus no indication at all that the ADA is concerned about whether an individual is capable of performing such functions. Therefore, if an individual can perform the essential functions of the job without accommodation as to those functions, regardless whether the individual can perform other functions of the job (with or without accommodation), then that individual is qualified under the ADA.

Unlike the majority, then, I believe that an individual need not show that she can perform all of the functions of the job without accommodation to satisfy the first step in the second element of the prima facie case. Rather, she needs to show only that she can perform the essential functions of the job without accommodation as to those functions.

C.

My reading is consistent with the object and policy of the statute. See, e.g., Crandon v. United States, 494 U.S. 152, 158 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."); In re Arizona Appetito's Stores, Inc., 893 F.2d 216, 219 (9th Cir. 1990) ("[I]f the statutory language gives rise to several different interpretations, we must adopt the interpretation which `can most fairly be said to be imbedded in the statute, in the sense of being most

harmonious with its scheme and with the general purposes that Congress manifested.' " (quoting N.L.R.B. v. Lion Oil Co., 352 U.S. 282, 297 (1957))).

Discussing a similar claim in the context of the Rehabilitation Act, the Supreme Court wrote that Congress intended the "regarded as" claim to combat society's "accumulated myths and fears about disability and disease." School Bd. of Nassau County v. Arline, 480 U.S. 273, 284 (1987). In order to combat these myths and fears, we must be aware of the contexts in which they arise. Only

34

then can we be sure that we are promoting the congressional goals of eliminating the "prejudiced attitudes or the ignorance of others." Id. The majority, examining the legislative history of and the regulations to the ADA, describes a number of factual circumstances in which an individual might be subject to these myths and fears.2 They include individuals with cosmetic impairments (e.g., facial scars) and high blood pressure, and individuals who have either been misdiagnosed by a physician (e.g., a misread X-ray) or are the subjects of rumors about their health (e.g., that the individual is infected with Human Immunodeficiency Virus ("HIV")). In each of these circumstances, employers may regard these individuals as disabled because of misperceptions about their non-limiting physical impairments or their actual, as opposed to misdiagnosed or rumored, health.

Missing from this catalogue of cases are those in which a visible physical impairment limits the individual in some respects but is not actually disabling. But the Supreme Court in Arline cited such cases in its discussion of the Rehabilitation Act, noting that Congress intended the "regarded as" claim in that act to cover, for example, a cerebral palsied child who was academically competitive and posed no physical threat to others, and a woman crippled with arthritis who could nevertheless do the job she sought. See id. at 283 n.9.3  Although I have no way of

_____

2. As the majority points out, see Maj. Op. at n.11, the legislative history
of the ADA "regarded as" claim cites to, and largely endorses, the Supreme Court's discussion in Arline of the purpose of protecting a "regarded as" plaintiff.

3. Although left unstated by the Supreme Court, I assume that in these examples the individuals suffered from some physical limitations that required accommodation from the school, in the case of the child, or

from her employer, in the case of the woman, as to non-essential functions of the school or the job. The majority argues that in neither of these examples is an accommodation necessary. That argument, like my own statement that each of these individuals indeed needed an accommodation, is itself an assumption. Nothing in Arline or the congressional statements to which it cites discloses whether these individuals required some accommodation.

empirically measuring the size of this class of cases, I suspect that the majority of instances in which an individual suffers from the prejudiced attitudes or ignorance of others occurs when the targeted individual exhibits some visible and limiting, though non-disabling, impairment, which affects the individual's capability to perform non-essential functions but not essential functions.4

In such cases, the effects of myth and fear are evident. Those encountering the individual are confronted immediately with the impairment and are naturally forced to assess its extent. If the impairment were somehow limiting, it would be unsurprising, though unfortunate, if prejudice or ignorance would lead those encountering the individual to misperceive the impairment as disabling. At least as I understand the ADA, this is exactly the scenario the "regarded as" claim was designed to prevent.

With this purpose in mind, it becomes clear that the proper reading of S 12111(8) is that the phrase "with or without reasonable accommodation" refers only to "essential functions." This reading ensures that the class of potential "regarded as" plaintiffs who exhibit some limiting but non-disabling physical impairment -- the very plaintiffs who would directly suffer from myth and fear -- can bring an ADA claim.

If, as the majority would otherwise have it, "without reasonable accommodation" does not refer only to"essential functions," then such potential plaintiffs would be foreclosed from bringing an ADA claim because many of

_____

That said, I believe that my assumption is more firmly grounded in reality. A child with cerebral palsy would likely be excused from gym, for example. A woman crippled with arthritis who worked as a clerk would likely be excused from lifting heavy file boxes, for another example. At all events, I seriously doubt that the cerebral palsied child or the woman crippled with arthritis would, as the majority claims, be able to show that he or she could perform each and every function of the school or the job "with ease." And, if he or she failed to make such a showing, the

"regarded as" claim would, under the majority's formulation, also fail.

4. Concomitantly, I suspect that the kinds of case described by the majority are the minority.

them, limited by their physical impairment, cannot perform all of the functions -- both essential and non-essential -- of the relevant employment position, and because they are not entitled to any accommodation. If I am correct that many of the "regarded as" plaintiffs will exhibit some limiting physical impairment, then the majority has significantly restricted the protection provided by the "regarded as" claim.

D.

My reading of S 12111(8) also comports with the interpretation given that provision by the Department of Justice ("DOJ") and the Equal Employment Opportunity Commission ("EEOC"), which are both charged with enforcing the ADA.5

The EEOC publishes a technical assistance manual for employers, other covered entities, and disabled persons to learn about their respective responsibilities and rights under the ADA. In describing the process to determine whether an individual is qualified under the Act, the manual states:

> (2) Determine if the individual can perform the essential functions of the job, with or without reasonable accommodation.

> This second step, a key aspect of nondiscrimination under the ADA, has two parts:

_____

5. The regulations adopted to implement the ADA are of no additional help in interpreting S 12111(8). The language in the regulations essentially parrots that of the statute. See 29 C.F.R. S 1630.2(m) (defining a qualified individual, inter alia, as one "who, with or without reasonable accommodation, can perform the essential functions of such position").

Although I cite to materials that have not been adopted pursuant to the Administrative Procedures Act, including public notice and comment, these materials are generally accorded some deference, though not the substantial deference that Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), requires of formally adopted

regulations, interpretations, and the like. Cf. Koray v. Sizer, 21 F.3d 558,
562 (3d Cir. 1994) (according some deference to the internal agency guidelines of the Bureau of Prisons that interpret statutory language).

37

* Identifying "essential functions of the job"; and

* Considering whether the person with a disability can perform these functions, unaided or with a "reasonable accommodation."

The ADA requires an employer to focus on the essential functions of a job to determine whether a person with a disability is qualified. This is an important nondiscrimination requirement. Many people with disabilities who can perform essential job functions are denied employment because they cannot do things that are only marginal to the job.

Equal Employment Opportunity Commission, A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act, II-12 (1992) (emphasis in original). I can think of no plainer statement for my position than the last paragraph I quote. The EEOC makes a clear distinction between essential and non-essential functions, and then states that it is only the essential functions about which the ADA is concerned. Nothing in this provision requires an examination whether an individual is or is not capable of performing a non-essential function.

Similarly, a pamphlet published jointly by the EEOC and the DOJ states that "[r]equiring the ability to perform `essential' functions assures that an individual with a disability will not be considered unqualified simply because of inability to perform marginal or incidental job functions." U.S. Equal Employment Opportunity Commission & U.S. Department of Justice, Civil Rights Division, The Americans with Disabilities Act, Questions and Answers 2 (1992). Finally, a handbook, also published jointly by the EEOC and the DOJ states that "[t]he purpose of this second step [in determining whether an individual is qualified] is to ensure that individuals with disabilities who can perform the essential functions of the position held or desired are not denied employment opportunities because they are not able to perform marginal functions of the position." U.S. Equal Employment Opportunity Commission & U.S Department of Justice, Americans with Disabilities Handbook I-37 (1992).

Each of these documents explains S 12111(8) and the regulations thereto. All of this material has one common theme; the emphasis in the qualified individual analysis is on the essential functions of the job only, separate and apart from the non-essential functions. This material therefore bolsters my view that an individual is qualified under the ADA if she can perform the essential functions of the job without accommodation as to those functions.

E.

The difference between my approach and that of the majority can be highlighted by an example. Imagine a plaintiff who has Tourette's syndrome.6  Assume that this plaintiff is not disabled under the ADA, but she does show visible signs of the syndrome, which, in her case, includes the occasional blurting out of obscenities. Our plaintiff is a janitor in a large office building. Assume that she can, without any accommodation thereto, perform all of the essential functions of her job. Assume, however, that a non-essential function of her job is the use, at all times, of polite, courteous language when interacting with other workers in the office building. Because the nature of her job is such that it need not be completed during the day, her supervisor, at the plaintiff 's request, has restructured her job so that the plaintiff works the night shift. That way, the plaintiff will not come into frequent contact with other workers in the office building. A new supervisor, unfortunately, replaces the earlier supervisor. He learns of our janitor's syndrome, regards the syndrome as a disability, and fires the janitor because he believes she cannot perform the job adequately.

Under the majority's formulation of the prima facie case, the janitor cannot bring an ADA claim. Although she satisfies the first element (she is regarded as disabled) and

_____

6. Gilles de la Tourette's syndrome is a "syndrome of facial and vocal tics
with onset in childhood, progressing to generalized jerking movements in any part of the body . . . with coprolalia." Dorland's Illustrated Medical Dictionary 1635 (27th ed. 1988). Coprolalia is the "compulsive, stereotyped use of obscene, `filthy' language, particularly of words relating to feces." Id. at 380.

the third element (she was fired because of her disability) of the prima facie case, she cannot meet the test for the second element. That is so because she cannot perform all of the non-essential functions of the job without accommodation, thereby failing the first step in the analysis, and she is not statutorily entitled to an accommodation, thereby failing the second step in the analysis. She would be, therefore, unqualified.

As I would fashion the second element of the prima facie case for an ADA claim, a plaintiff need only show that she is capable of performing the essential functions of the relevant employment position without accommodation as to those functions. Under my suggested formulation of the test, then, our janitor would be qualified for the job because she would be able to perform all of the essential functions of the job without accommodation thereto. Concededly, our janitor, to perform all the functions of her job, must be accommodated.7

I submit that our hypothetical janitor is exactly the type of plaintiff Congress had in mind when it created the "regarded as" claim. If we were to foreclose her ability to bring an ADA claim, as the majority would have it, we would be undermining congressional intent.

F.

In the present case, then, I believe a remand is in order. There is no dispute that Deane cannot engage in heavy lifting, a function of the nursing positions she sought at the Pocono Medical Center. I believe there is, however, a genuine issue of fact as to whether heavy lifting is an essential function of those positions. Such a determination is material to Deane's claim, at least as I read the ADA; if heavy lifting is not an essential function, and if Deane can perform the remainder of the essential functions of the nursing positions she sought, then she has satisfied the second element of the prima facie case.

_____

7. However, I make no claim that such accommodation is statutorily required. As I note supra part I.A., I reserve comment as to whether a "regarded as" plaintiff is entitled to accommodation.

40

I believe further that Deane has also presented enough evidence to raise a genuine issue of material fact as to whether the Pocono Medical Center regarded her as disabled, the first element of her prima facie case.8

II.

I recognize that my reading of the ADA might lead to a superficially bizarre result, which, upon examination, disappears but is, at all events, both logical and completely consistent with congressional intent. To illustrate this result, let us recall our hypothetical janitor. Under my reading of the ADA, our janitor would be permitted to bring a claim against her employer on the grounds that her employer fired her because she was regarded as disabled despite the fact that she could perform the essential functions of the job without accommodation. Assume that she wins her case, receives damages, and is returned to this job. At this point, our janitor can no longer bring a claim under the ADA, because she would be unable to meet the first prong of the prima facie case. As we have seen, she is not actually disabled, at least as that term is narrowly defined by the ADA, and has no history of a disabling impairment. Nor is she regarded as disabled, a statement I make with confidence because, having lost the case against it, her employer will presumably have been disabused of its notion that our janitor is disabled. Her employer can therefore immediately turn around and fire her for her inability to perform all of the functions of the job.

To some, then, my interpretation impermissibly leads to an untoward result. See, e.g., United States v. Schneider, 14 F.3d 876, 880 (3d Cir. 1994) ("It is the obligation of the court to construe a statute to avoid absurd results, if alternative interpretations are available and consistent with the legislative purpose."). In the end, the employer gets exactly what it initially wanted (to rid itself of our janitor), but had to fight (and lose) a lawsuit to do it, while our

_____

8. There is no dispute that Deane suffered an adverse employment action, the third element of the prima facie case.

41

janitor suffers the very fate she was suing to avoid (losing her job), but does so only after winning her case. 9

This result, however, conforms with the venerable "mischief " rule, that canon of construction that "directs a court to look to the `mischief and defect' that the statute was intended to cure." Elliott Coal Mining Co. v. Director, Office of Workers' Compensation Programs, 17 F.3d 616, 631 (3d Cir. 1994) (quoting Heydon's Case, 76 Eng. Rep. 637 (Ex. 1584)).10 Congress intended the "regarded as" claim at issue here to cure the "mischief" of prejudice against and ignorance about disability and disease, which

prejudice and ignorance might lead employers to make employment decisions based on misperceptions.11 That is exactly what our janitor did by bringing her lawsuit; she exposed the myths and fears surrounding Tourette's syndrome. The mischief having been cured, there is no more work for the "regarded as" claim, or the ADA for that matter, to do. No longer mistaken about Tourette's syndrome, our janitor's employer now treats our janitor the same as any other janitor in its employ. The goals of the "regarded as" claim have thus been accomplished. As far as

_____

9. The result does not mean that the janitor has ultimately been denied some meaningful, lasting remedy, as the majority claims. As I have already noted, she is potentially entitled to damages for the firing.

10. The majority's suggestion that I misuse the mischief rule is incorrect.
The mischief rule is an interpretive technique employed to ensure that a statute "will be construed to apply only so far as is needed to remedy the perceived mischief." 2B Norman J. Singer, Sutherland on Statutes and Statutory Construction, S 54.04 (5th ed. 1992). That is precisely what I am endeavoring to do: remedy the prejudice and ignorance that distorts employment decisions.

11. The majority's claim that I have misconceived the "mischief " that the "regarded as" claim was meant to prevent is unfounded. The elimination of prejudice and ignorance is integral to ensuring that otherwise qualified individuals are not excluded from the workplace. As I explained in part I.C., the majority's formulation of the prima facie case will foreclose the ADA claims of many "regarded as" plaintiffs who may have been harmed by such prejudice and ignorance. If they are unable to bring ADA claims, such plaintiffs will be unable to eliminate that prejudice and ignorance, thereby ensuring that otherwise qualified individuals may suffer adverse employment decisions because they are the subjects of misinformation.

42

the ADA is concerned, if our janitor's employer makes irrational or unfair employment decisions based on factors other than a disability, so be it.

But that is far from the end of the analysis. For, I suspect that which is untoward is not the putative result of my hypothetical but the hypothetical itself in that, under the circumstances described, I seriously doubt that the janitor would be fired. More likely, the employer would probably not fire her but just have her work at night, either because the employer is now enlightened or would prefer to avoid a possible second lawsuit. In such event the purposes of the ADA, unattainable under the majority's approach,

would be vindicated.

III.

The ADA presents subtle issues of statutory interpretation, far more subtle and difficult I might add, than those prescribed under the other anti-discrimination statutes (Title VII, ADEA etc.). Compounding the difficulty in this case was the unusual nature of Deane's claim. It is unsurprising, then, that this case has generated disagreement over the meaning of the ADA. With due respect for the majority, I believe that my interpretation of the relevant statutory language is the correct one. I therefore respectfully dissent.

A True Copy:
Teste:

   Clerk of the United States Court of Appeals
   for the Third Circuit

43